

JKMcD:MJC: USAO#2015R00339

DEC 18 2019

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA** | CRIMINAL NO. CCB-19-0598 |
| v. | |
| **PHILIP MICHAEL LOVERDE,** **Defendant.** | (Conspiracy to Extort Under Color of Official Right, 18 U.S.C. § 1951(a)) |

## INFORMATION

### COUNT ONE

The United States Attorney for the District of Maryland charges that:

### Introduction

At all times material to this Information:

**A.  Baltimore City Departments**

1. The City of Baltimore is an incorporated municipality in the State of Maryland that, pursuant to its Charter, established various administrative departments including the Department of Public Works ("DPW") and the Department of Transportation ("DOT").

2. DPW is responsible for managing solid waste, wastewater, storm water and clean water services for over 1.8 million residents in the Baltimore metropolitan area. Within DPW, the Water and Wastewater Maintenance Division ("WWMD") was responsible for supplying drinking water and sewer service within the service area.

3. The Baltimore City Code, Article 24 entitled "Water" in Section 21-6 (b) entitled "Prohibited Conduct" stated:

> "Unless authorized by law or by permit from the Department of Public Works, no person may
>
> (1) connect, disconnect, tap, or interfere or tamper with any of the... mains, pipes, conduits, connections, taps, valves, engines or machinery belonging to the City;

> (2) connect with any main, pipe, conduit, connection, tap, valve, engine or machinery for the purpose of using or wasting water;
> (3) tamper in any way with any meter used to register water consumption; or
> (4) introduce water to any premises not entitled to use it."

4. When a Baltimore City property owner planned to install new or upgraded water service, Baltimore City required the property owner to use a bonded, approved utilities contractor to perform the work; DPW did not perform installation of new water, sewer or fire line services. When the Baltimore City property was a commercial property, the property owner was required to install a sprinkler system inside the building for fire protection and to install a separate connection of a designated size from the Baltimore City water main to create a separate, dedicated water supply for the sprinkler system.

5. DPW required the property owner or their utilities contractor to submit a work proposal setting forth the work to be performed for new or upgraded water service. Also the utilities contractor was required to submit to DOT the proposed project's requirements for work in the public right of way, such as street cuts and excavation to access and tap the City water mains. DOT and DPW reviewed the work proposal to determine if the estimates were appropriate for the work to be done, approved the proposal, and issued the permits necessary to perform the street cuts and access and connect to Baltimore City's water main and/or sewer system. DOT, Office of Right of Way Services, assessed a $300 traffic control fee and an inspection fee for City costs related to street-cut permits, inspections and water meter purchases. The inspection fee was assessed as 9% of the contract cost for the water utilities work. DPW and DOT required the utilities contractor to obtain a bond or letter of credit for the total cost of the renovation.

6. In Baltimore City, water mains and sewer pipes are separate systems which are generally located underneath public streets or alleys. Each property which receives water service

must be connected to a DPW water main. The connection is from the DPW water main through a pipe to a water meter vault and from the water meter vault through a pipe to the interior of the house or building. Once installed, the meter vault can be accessed by lifting the meter vault's plate, usually located near the property and on the sidewalk. When the plate is lifted, the water meter is visible. Likewise, the house or building has a pipe which connects to the DPW sewer pipes.

7. After a new or upgraded connection from the City water main to the meter vault was completed, DPW inspected the work and, if approved, DPW created a customer service account to bill the property owner for the purchase of the water meter and to measure and bill for water usage at the property.

8. DPW prohibited all WWMD employees from installing private water services and accepting a monetary payment while on duty, installing private water service while working on "City time" and soliciting private jobs while they were on duty.

B. **Relevant Persons and Entities**

9. At all times material to this Information, Ronald Maurice Smith ("Smith") was a supervisor in the Water and Waste Management Division of DPW. Smith was responsible for receiving work orders, dispatching work crews, and supervising work crews on DPW job sites in connection with service repairs to City water mains, pipes, taps, connections, and valves. Smith has never possessed a plumbing license from the State of Maryland. Smith worked out of the 806 North Haven Street DPW facility and supervised approximately eight (8) employees. Smith generally worked the night shift from midnight to 8 a.m.

10. At all times material to this Information, **PHILIP MICHAEL LOVERDE** ("**LOVERDE**") was a licensed plumber in the State of Maryland and one of the owners of All Service Plumbing and Drain Cleaning and All Service Plumbing and Heating (collectively "All

3

"Services."). All Services provided plumbing and heat system installation and repair services in the Baltimore area. All Services was not approved by the City of Baltimore as a bonded approved contractor able to perform work on the City's water mains.

11. At all times material to this Information, a Project Manager, identified as G.H., was employed with TRF Development Partners ("TRF"), a nonprofit housing affiliate and community developer with its main offices in Philadelphia, PA. TRF Development Properties contracted with East Baltimore Historic II LLC to provide property rehabilitation and construction services. Both TRF and East Baltimore Historic II engaged in interstate commerce by soliciting private investors in Pennsylvania and elsewhere and by engaging in building projects in which services and materials moved in interstate commerce.

## THE CHARGE

12. During the period from, in and around January 2014 to February 2016, in the District of Maryland and elsewhere, the Defendant:

### PHILIP MICHAEL LOVERDE,

Smith, and others, did knowingly conspire to obstruct, delay and affect commerce and the movement of articles and commodities in commerce by extortion, and attempt to do so, that is Smith obtained property with assistance from **LOVERDE** not due to Smith or his office, from private parties, under color of official right.

## PURPOSE OF THE CONSPIRACY

13. It was the purpose of the conspiracy that Smith with **LOVERDE**'s assistance would personally enrich Smith and others by using Baltimore City employees, equipment, and materials to install new and upgraded water, sewer, and fire line services for private developers and property owners without obtaining the required permits, approvals, and inspections from DPW and DOT, without paying the Baltimore City fees for water, sewer and/or fire line service

installation permits and DOT traffic control, and without installing water meters while charging lower prices to the private developers and property owners than City approved, bonded, licensed utilities contractors would charge.

## MANNER AND MEANS OF THE CONSPIRACY

14. It was a part of the conspiracy for **LOVERDE** to obtain plumbing and heating contracts for All Services and to direct developers, contractors, and property owners to Smith, who used his authority as a DPW supervisor to cause a DPW work crew, including a heavy equipment operator using DPW equipment, to install new water services to private properties, all without obtaining the necessary permits.

15. It was a part of the conspiracy for Smith to be paid in cash by the private property owners or developers either because Smith asked for a cash payment or caused **LOVERDE** to create false All Services invoices for work performed by Smith and DPW crews and caused **LOVERDE** to submit false All Services invoices to the private property owners or developers.

16. It was part of the conspiracy for **LOVERDE** to submit false All Services invoices, and when All Services was paid, for **LOVERDE** to cash the checks and provide the cash to Smith.

17. It was part of the conspiracy for Smith to cause other DPW employees to create and submit false and fictitious DPW service requests and work orders for the purpose of concealing the use of DPW employees and equipment to install new water, sewer and/or fire line services.

18. It was a part of the conspiracy for Smith to cause DPW personnel to place metal plates over the street cuts DPW personnel had made to install the new water service and eventually to use DPW equipment, personnel and materials to re-pave where the street cuts and excavation had occurred.

19. It was a part of the conspiracy for Smith to use DPW crews, equipment, and material to make street cuts and excavate to provide new water and sewer services at 1234, 1236, 1238, 1240, 1242, 1244, 1246, 1248 and 1250 N. Gay Street, Baltimore, Maryland, and 1759 East Preston Street, Baltimore, MD.

## OVERT ACTS

20. In the District of Maryland and elsewhere, the co-conspirators Smith, **LOVERDE**, and others committed the following overt acts:

   a. In October or November 2015, GH on behalf of TRF needed to install a required fire line at the commercial property at 1759 East Preston Street, and after receiving a $35,000 estimate from a bonded approved contractor, asked **LOVERDE** to obtain an estimate to install the fire line at 1759 East Preston Street from Smith.

   b. On October 22, 2015, **LOVERDE** telephoned Smith and asked Smith for an estimate to install a four inch fire line at 1759 East Preston Street and instructed Smith to meet with GH at that location.

   c. On October 23, 2015, Smith and GH spoke via the telephone and GH stated that he would meet Smith at North Gay Street on October 23, 2015.

   d. In October or November 2015, GH told **LOVERDE** that he met Smith at 1759 East Preston and Smith provided an estimate of $17,500, for the fire line installation at 1759 East Preston Street, which was much cheaper that the City approved and bonded contractor's estimate.

   e. In the fall of 2015, **LOVERDE** and GH agreed that **LOVERDE** would submit a false All Services purchase order and invoice, in the amount of $17,500, to TRF for the purpose of obtaining payment through All Services while concealing Smith and DPW's involvement in the installation of the fire line at 1759 East Preston Street.

    f.    On October 30, 2015, Smith caused a DPW work order to be generated and a DPW investigative report entry indicating that DPW employees conducted a TV inspection at 1759 East Preston Street.

    g.    On November 2, 2015, **LOVERDE** submitted a false All Services purchase order and invoice to TRF, indicating that All Services installed the fire line at 1759 East Preston Street.

    h.    On or about November 12, 2015, Smith and **LOVERDE** through G.H. caused TRF to issue a check to All Services in the amount of $17,500.

    i.    On December 14, 2015, **LOVERDE** and Smith spoke via telephone and **LOVERDE** warned Smith that a DPW official arrived at 1759 East Preston Street and questioned the work that was done related to the street cut.

    j.    On or about December 14, 2015, Smith and GH spoke via telephone.

18 U.S.C. § 1951(a)

Robert K. Hur
United States Attorney

12/18/19
Date